## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

IN RE:                                              **Chapter 7**
**VANCE G. HALL,**
    **Debtor.**                                 **Case Number 16-61894**

**JUDY A. ROBBINS,**
**United States Trustee for Region Four,**
    **Movant,**

**v.**                                              **ECF Doc. No. 19**

**VANCE G. HALL,**
    **Respondent.**

### MEMORANDUM DECISION

The United States Trustee asserts that the totality of Mr. Hall's financial circumstances demonstrates abuse of the provisions of chapter 7 of the Bankruptcy Code under section 707(b)(3)(B). On this basis, the United States Trustee moves this Court to dismiss Mr. Hall's case pursuant to section 707(b)(1). For the reasons set forth below, the Court denies the United States Trustee's motion.

### FINDINGS OF FACT

The narrative facts are largely uncontested. What is contested is whether Mr. Hall's circumstances establish an abuse of chapter 7.

On September 22, 2016, Vance G. Hall filed a petition under chapter 7 of the Bankruptcy Code. ECF Doc. No. 1. Mr. Hall owns a house which is security for two mortgages. His wife (who is not a joint debtor in this case) owns a house which secures one mortgage. Mr. Hall primarily lives in the house owned by his wife. In this bankruptcy, Mr. Hall claims expenses for

1

his house but also claims expenses for his wife's house. It is this circumstance (expenses for two houses for one family) that is the source of the quarrel.

*Forsythia Drive*

In 2005, before he was married, Mr. Hall purchased his first home located at 2256 Forsythia Drive, Culpeper, VA 22701 ("Forsythia Drive"). Forsythia Drive is a three-bedroom townhome with approximately 1,433 square feet. Tr. 94:13–19. At the time he purchased the home, Mr. Hall was offered a loan secured by a first deed of trust with adjustable interest only payments for the first ten years with principal and interest thereafter,[1] and a second loan secured by a deed of trust with interest only terms, although "unfortunately [he] didn't fully realize what that meant at the time."[2] Tr. 94:20–25; Answer at p.5. Naturally, Mr. Hall did not predict the looming real estate crisis and the swift decline in property values that would materialize in the coming years.

Mr. Hall accepted the offers and granted two deeds of trust on Forsythia Drive. At first, the monthly payments on the first and second deeds of trust were $690 and $447.25, respectively. Tr. 95:1–25. Mr. Hall maintained these payments and other expenses associated with this house without default. Tr. 97:22–98:7, 99:4–24.

In July 2015, the payments on the first deed of trust on Forsythia Drive adjusted from $690 to $1,095. *See* Sch. J; Tr. 101:8–23. Following the 58.7% increase in payment on the first deed of trust, Mr. Hall communicated frequently with the mortgage company to negotiate an alternative—including a short sale, deed in lieu, refinancing or mortgage modification—but was

---

[1]     The type of loan typically is made with an expectation of refinancing at the end of the interest only period.

[2]     At this time, Mr. Hall had a high school diploma, and had completed a string of community college classes but did not yet have a certificate or college degree. Tr. 89:22–91:14. At the time he made the loan, Mr. Hall had never entered into a financial transaction of this type. Tr. 152:2–5.

unsuccessful in his attempts. Tr. 104:7–105:18, 141:22–142:8, 143:16–144:9. Each of these options requires the consent of the mortgage holders.

It is not surprising that Mr. Hall could not obtain the mortgage holders' consent to a sale, restructuring, or a reduction of the debt. First, he had been unable to maintain his homeowners' association ("HOA") dues and so the HOA issued a lien against Forsythia Drive.[3] Tr. 105:9–18. Second, the amount of the mortgage debt dwarfed the value of the property. Forsythia Drive's market value plummeted a few years after Mr. Hall purchased it. It is still low today. Currently, Forsythia Drive is tax assessed at $150,000. Tr. 98:8–13. Mr. Hall testified that in his opinion the house could be worth as much as $190,000. *Id.* Yet neither value approaches the more than $270,000 owed on both deeds of trust. *See* Sch. D; UST Ex. 11, 13; Tr. 80:4–8.

*Family and Continued Education*

On May 6, 2006, Mr. Hall married Cassandra Hall, who had twin children from a previous relationship. Mot. to Dismiss ¶ 11; Answer ¶ 11; Tr. 80:15–22. Mr. Hall welcomed his new wife and children[4] into his home, but he "realized quickly after becoming a husband and a father of two that [he] needed to make more money, so [he] decided to continue [his] education by going to George Mason [University]." Tr. 92:4–6. Mr. Hall enrolled in night classes and received his Bachelor of Science Degree four years later in 2010. Tr. 92:13–17. Shortly thereafter, Mr. and Mrs. Hall had a baby daughter. Wanting to increase his income and advance his career further, Mr. Hall subsequently achieved a Master's Degree in March 2014. Tr. 92:18–93:9.

---

[3] Mr. Hall testified that he cured the arrearage to the HOA and had the liens released yet was still unable to obtain the mortgage holder's consent. Tr. 142:22–143:10.

[4] The twins live with Mr. and Mrs. Hall full time. They have never met their biological father and receive no support from him. Tr. 91:21–25.

*Lakeland Court*

Mr. Hall's seventy-two-year-old mother-in-law suffers from dementia. Tr. 102:3–13. She was living alone in a trailer in Stevensburg, Virginia. Tr. 102:7–9. Mr. and Mrs. Hall would visit daily to provide care. Tr. 102:14–19. It soon became clear, however, that Mr. Hall's mother-in-law could no longer live alone and needed to move in with the family. Tr. 102:20–103:4.

After consultation with her husband concerning the need to move her mother into their home, Mrs. Hall purchased a single-family home located at 844 Lakeland Court, Culpeper, Virginia ("Lakeland Court"). Tr. 103:5–14; Mot. to Dismiss ¶ 19. Lakeland Court is larger than Forsythia Drive and has an extra room to accommodate Mrs. Hall's mother.[5] Tr. 100:16–21. Mr. Hall, his wife, mother-in-law, teenage twins, and young daughter moved into the four-bedroom Lakeland Court house.

*Employment Pre- and Post-Petition*

Mr. Hall works in the IT industry. Tr. 81:23–25. When he filed his chapter 7 petition, Mr. Hall was employed by George Washington University in Washington, DC. Tr. 82:1–3. Mr. Hall's daily commute was two hours each way. Tr. 82:4–14. After he filed this case, Mr. Hall accepted a new position as an IT auditor for a company located in Manassas, Virginia, closer to his home. Tr. 82:19–83:24. Prior to Mr. Hall filing his bankruptcy petition, Mrs. Hall went from working part-time to full-time as a teleservices representative. Tr. 93:10–94:2. Although Mr. and Mrs. Hall's income increased both before and after Mr. Hall filed his bankruptcy petition, it is undisputed that Schedule I accurately discloses the family's income as of the petition date.

---

[5] Mr. Hall's mother-in-law does not contribute financially to the household. Tr. 118:1–3.

*Bankruptcy Motions*

By the time he filed chapter 7, Mr. Hall was in default on his mortgage payments on Forsythia Drive. The holder of the first deed of trust on Forsythia Drive filed a motion for relief from stay early in bankruptcy case, alleging a four month payment default. *See* ECF Doc. No. 8. Neither Mr. Hall nor the chapter 7 trustee contested the motion for relief, and so the Court granted relief from stay on December 15, 2016. ECF Doc. No. 17. A few weeks later, on January 3, 2017, the United States Trustee moved to dismiss this case.

The Court held the hearing on April 20, 2017. At the conclusion of the hearing, the Court took the matter under advisement.[6]

## JURISDICTION

Mr. Hall is a debtor in this Court. The Court has subject-matter jurisdiction under 28 U.S.C. § 1334(a) and authority to hear the case under 28 U.S.C. § 157(a), with the delegation made to this Court by Order of Reference from the District Court entered on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the Western District of

---

[6]   At hearing, the United States Trustee moved to admit into evidence Exhibits 10, 17, 23, 25, and 27, which are spreadsheet summaries prepared by the Office of the United States Trustee. The parties agreed that the exhibits could be used for demonstrative purposes during the hearing, and the Court recognized their value as demonstrative exhibits.

Mr. Hall, however, objected to the admission of the spreadsheets into evidence for proof of substance. Mr. Hall argued that the spreadsheets were fatally flawed and misleading due to erroneous assumptions. Mr. Hall further asserted that the spreadsheets ignored other relevant considerations. Tr. 71:10–72:15. The United States Trustee argued that the spreadsheets were admissible as substantive evidence because they were based on documents received in response to a document request. The United States Trustee further contended that the Court would not be confused or misled by what the spreadsheets represented. Tr. 73:3–75:5. The United States Trustee did, however, acknowledge that all the documents upon which the spreadsheets were based were admitted into evidence. Tr. 76:2–5.

The Court took the objection under advisement. Federal Rule of Evidence 1006 permits the use of "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. "The purpose of this Rule is to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives from the voluminous documents." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004).

At hearing, the parties were able to present all the exhibits upon which the spreadsheets are based. Since the Court was able to examine the exhibits at hearing, the Court does not find that the exhibits were voluminous. The Court concludes that the spreadsheets do not need to be admitted into evidence to prove the content of the other, already-admitted exhibits. Accordingly, the Court sustains Mr. Hall's objection to the admission of Exhibits 10, 17, 23, 25, and 27.

Virginia.  This question whether to dismiss Mr. Hall's bankruptcy case is a "core" bankruptcy proceeding under 28 U.S.C. § 157(b)(2)(A).

## CONCLUSIONS OF LAW

The United States Trustee moves to dismiss this case under section 707(b) of the Bankruptcy Code.  Section 707(b) provides, in relevant part, that

> (1) After notice and a hearing, the court . . . on a motion by the United States trustee . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1).  The parties agree that Mr. Hall's debts are primarily consumer debts. The United States Trustee timely filed this motion to dismiss alleging that the granting of a discharge would be an abuse of chapter 7.

A chapter 7 discharge is presumptively abusive if debtors, whose income exceeds the applicable median family income, have disposable income as calculated under the section 707(b)(2) statutory threshold test to establish a presumption of abuse (the "means test").  11 U.S.C. § 707(b)(2)(A), (b)(6); *see Williams v. McDow (In re Williams)*, Civ. No. 5:10CV00049, 2010 WL 3292812, at *1 (W.D. Va. Aug. 19, 2010) (summarizing presumption of abuse analysis).  The United States Trustee concedes that the presumption of abuse does not arise in Mr. Hall's case.

Because no presumption of abuse is present and the United States Trustee does not contend that Mr. Hall filed the petition in bad faith, the United States Trustee relies on section 707(b)(3)(B) to support dismissal.  Accordingly, the United States Trustee argues that the totality of Mr. Hall's financial circumstances demonstrate that granting a chapter 7 discharge would be an abuse of the Bankruptcy Code.  This means that the United States Trustee has the burden to

prove circumstances which, on balance, establish that granting Mr. Hall a chapter 7 discharge would be an abuse. 11 U.S.C. § 707(b)(3)(B).

Under section 707(b)(3)(B), "the court shall consider . . . [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." *Id.* While the section 707(b)(2) means test provides an objective, mechanical method of determining abuse, "under [section] 707(b)(3) the abuse . . . must be shown, if at all, through an analysis of both subjective and objective factors." *In re Alther*, 537 B.R. 262, 270 n.5 (Bankr. W.D. Va. 2015). The Court, therefore, must employ a case-by-case analysis. This makes sense because circumstances, and the corresponding impact of such circumstances, are never exactly the same.

This case-by-case analysis requires weighing an amalgam of subjective and objective factors, not specified by the statute but left to the discretion of the Court. The Fourth Circuit, in *Green v. Staples (In re Green)*, 934 F.2d 568 (4th Cir. 1991), adopted a "totality of the circumstances" test for "substantial abuse." *Id.* at 573. *Green* did so before a test for "abuse" was statutorily inserted into the Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").[7] In *Green*, the Fourth Circuit explained that:

> The "totality of the circumstances" approach involves an evaluation of factors such as the following:
> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

---

[7] BAPCPA removed the word "substantial" from the test. The statute now contains an objective means test. As such, based on mathematics, either abuse is presumed or it is not.

Exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors. The debtor's relative solvency may raise an inference that such a situation exists.

*Id.* at 572 (citations and footnote omitted).

*Green* noted that "[t]he debtor's relative solvency may raise an inference that such a situation [of abuse] exists." *Id.* Fourteen years after the Fourth Circuit recognized such a presumption of abuse, Congress inserted a statutory means test which accomplished the presumption of abuse for a debtor who has a relative ability to pay.

In its only post-BAPCPA discussion of the *Green* factors, the Fourth Circuit affirmed dismissal of a chapter 7 case after "[t]he bankruptcy court found a multitude of factors weighing in favor of abuse." *Calhoun v. U.S. Tr.*, 650 F.3d 338, 342 (4th Cir. 2011). Although their "enduring applicability" may be of question after the statutory changes to section 707, all the same, the *Green* factors remain instructive in a totality of the circumstances analysis. *See id.* (finding dismissal was appropriate under the *Green* factors and adding the court "need not make a determination as to the enduring applicability of the holding in *Green*"); *accord Bankr. Adm'r v. Gregory*, 471 B.R. 823, 829 (E.D.N.C. 2012).

Federal Rule of Bankruptcy Procedure 1017(e)(1) requires that "a motion to dismiss under § 707(b)(1) and (3) shall state with particularity the circumstances alleged to constitute abuse." Fed. R. Bankr. P. 1017(e)(1). The requirement for particularity was added in a 2008 amendment to reflect the 2005 amendments to the Bankruptcy Code.[8]

---

[8]    The Committee Note from 2008 states, "[i]n contrast to the grounds for a motion to dismiss under § 707(b)(2), which are quite specific, the grounds under § 707(b)(1) and (3) are very general. Therefore, to enable the debtor to respond, subdivision (e) requires that motions to dismiss under § 707(b)(1) and (3) state with particularity the circumstances alleged to constitute abuse."

The burden is ultimately on the movant to prove the totality of the debtor's financial circumstances demonstrates abuse. *Accord In re Almond*, 344 B.R. 470, 479 (Bankr. W.D. Va. 2006). If the United States Trustee meets her burden, it is in the Court's discretion to dismiss the case under section 707. *See* 11 U.S.C. § 707(b)(1) ("[T]he court . . . may dismiss a case . . . .").

Here, the United States Trustee cited the *Green* factors, but although she identified the presence of more than one of the *Green* factors, the bulk of her argument focused on the ability to pay. The Court agrees that the *Green* factors are instructive. The Fourth Circuit in *Green* identified factors generally related to behavior pre-bankruptcy (the calamity leading to the petition or the spending behaviors prior to bankruptcy) and conduct post-bankruptcy (such as misrepresenting income and manipulating expenses) and warned that an ability to pay alone (that is, without other factors) is not a sufficient basis for a finding abuse. *Green*, 934 F.2d 572.[9] With that in mind, the Court will apply the *Green* factors.

In her motion, the United States Trustee pled that the totality of Mr. Hall's financial situation demonstrates that it would be an abuse of chapter 7 for him to receive a discharge. According to the United States Trustee, Mr. Hall: 1) did not file his case because of an inability to make payments to his unsecured creditors; 2) is budgeting for payments for Forsythia Drive that are unreasonable and not necessary for his or his dependents' support; 3) claims additional unreasonable and unnecessary expenses on Schedule J; 4) has the ability to make payments to his creditors whether inside or outside bankruptcy; 5) has the ability to repay a substantial portion of the scheduled unsecured creditors' claims in a chapter 13 plan over five years; 6) is voluntarily contributing to a retirement plan; and 7) has along with his wife stable, well-paying sources of

---

[9]     Although the Fourth Circuit in *Green* agreed "that the debtor's ability to repay is the *primary* factor to be considered" in a totality of the circumstances analysis, the Fourth Circuit instructed that an ability to pay alone is not a sufficient basis for a finding abuse. *Green*, 934 F.2d at 572 (emphasis in original); *see also id.* ("[S]olvency alone is not a sufficient basis for a finding that the debtor has in fact substantially abused the provisions of Chapter 7.").

income.   These seven circumstances reiterate the same point: according to the United States Trustee, Mr. Hall has the ability to repay a portion of his debts.

The Court turns to the merits of the motion.  In addition to the pleadings, the Court will consider the evidence presented, the record in the case, and the skillful arguments of counsel. The Court will apply the *Green* factors.  The Court will decide if the United States Trustee has met her burden and shown that granting Mr. Hall a chapter 7 discharge would be an abuse of the Bankruptcy Code.

A.   <u>Whether the bankruptcy petition was filed because of sudden illness, calamity,</u> <u>disability, or unemployment</u>

The United States Trustee asserts that Mr. Hall has not suffered any sudden, unforeseen misfortune.  She maintains this factor weighs in favor of granting her motion to dismiss.

Mr. Hall disagrees.  He points to his mother-in-law's worsening dementia during the period leading up to his bankruptcy.  Mr. Hall's uncontroverted testimony explained how his mother-in-law was no longer able to live on her own in her trailer without the assistance of a caregiver, and how the family was unable to afford a private caregiver.  And so, Mr. Hall and his wife agreed to move her mother into their home.  Forsythia Drive was too small to accommodate the entire family.  For this reason, Mrs. Hall purchased Lakeland Court.  She did so at a time when Mr. Hall could not sell, refinance or otherwise find a way out from under costs associated with Forsythia Drive.  The United States Trustee's point (that this circumstance was not sudden and Mr. Hall individually did not experience a calamity) is well-taken but she overlooks the impact on Mr. Hall of an elderly, dependent family member with escalating dementia.  In the least, the Court finds that caring for his ailing mother-in-law contributed to Mr. Hall's financial difficulties.

Having considered these circumstances, in the end, the Court finds this factor weighs neither in favor of the United States Trustee's position nor Mr. Hall's. The Court joins Judge Kenney that "if a debtor has suffered sudden illness or loss of employment it may favor the debtor under the totality of the circumstances, but if the debtor has not suffered a catastrophic event pre-petition it will not work against her." *In re Campbell*, Case No. 15-13426-BFK, 2016 WL 4150663, at *10 (Bankr. E.D. Va. Aug. 3, 2016). After all, "many chapter 7 consumer bankruptcies are the result of the debtor's exhaustion with the collection process. Many debtors simply say 'enough is enough,' and there's nothing to suggest bad faith about that." *Id.*

B. <u>Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay</u>

According to Schedule E/F, Mr. Hall has $79,526 of unsecured debt. The majority of this amount—$60,000, or more than 75%—is student loan debt incurred between 2006 and 2010, which will not be discharged. The remaining $19,526 is for consumer credit. The United States Trustee presented no evidence that Mr. Hall incurred cash advances leading up to his filing. Likewise, she failed to show Mr. Hall made consumer purchases far in excess of his ability to repay. Based on a review of the evidence, the Court finds that Mr. Hall's spending behavior prior to the filing of his petition weighs against the United States Trustee's position and does not demonstrate abuse of the bankruptcy process. *Cf. In re Fox*, 521 B.R. 520, 531 (Bankr. D. Md. 2014) (finding abuse where debtors compiled over $90,000 in credit card debt, in addition to failing other *Green* factors).

C. <u>Whether the debtor's proposed family budget is excessive or unreasonable</u>

For this factor to weigh in favor of dismissal, the Court must determine the proposed budget is excessive or unreasonable. The United States Trustee argues many of Mr. Hall's

expenses are excessive or unreasonable, such as before and after school care for his six-year-old

daughter, food and care for the family dog, commuting expenses, insurance for the family's

vehicles, expenses relating to the children's extracurricular activities at school, and Mr. Hall's

expenses for education and certifications required for his continued employment.  *See* Mot. to

Dismiss ¶ 29.   The major grievance of the United States Trustee, however, is the expenses

associated with Forsythia Drive.

As addressed more specifically below in section F, the Court does not find the proposed

family budget excessive or unreasonable to warrant dismissal.  Mr. Hall's budget as presented

does not reflect an overindulgence or luxurious lifestyle.  *Cf. Fox*, 521 B.R. at 531 (finding the

proposed budget to be "excessive and unreasonable"); *In re Brace*, 430 B.R. 513, 515 (Bankr.

N.D. Ill. 2010) (agreeing with the United States Trustee that the debtor could eliminate

"excessive or unnecessary expenses"); *In re Norris*, 225 B.R. 329 (Bankr. E.D. Va. 1998)

("Debtors have lived beyond their means . . . . [D]ebtors propose by filing chapter 7 to maintain

their more-than-adequate lifestyle at the expense of their creditors.").  This factor falls in favor of

Mr. Hall.

D.   Whether the debtor's schedules and statement of current income and expenses

reasonably and accurately reflect the true financial condition

The United States Trustee's only evidence on this factor is that Mr. Hall listed a $50

expense on line 18 of Schedule J for alimony even though Mr. Hall does not pay any alimony.

Testimony from Mr. Hall clarified that this was a scrivener's error and the $50 was intended for

line 19 as support for his mother-in-law.  Tr. 116:8–21.  The remaining allegations with respect

to the expenses on Schedule J (as adjusted and detailed below) are not whether they reflect the

true financial condition of Mr. Hall but whether they are reasonable or excessive.  The United

States Trustee does not suggest that Mr. Hall failed to disclose income or concealed assets, but notes that Mr. and Mrs. Hall's income increased substantially post-petition (to which Mr. Hall agreed). This is, of course, critical to the ability-to-pay analysis, but has no bearing on the accuracy of Mr. Hall's disclosures as of the petition date.[10] Based on a review of the evidence, this Court finds that Mr. Hall did not conceal assets or fail to correctly disclose income on his bankruptcy schedules and statements. *Cf. Fox*, 521 B.R. at 531 (finding material misrepresentations and concealment of income and assets).

On the evidence presented, the Court finds that Mr. Hall reasonably and accurately reflected his financial condition on his schedules and statement of current income. This factor weighs against dismissal.

### E. Whether the petition was filed in good faith

Although the United States Trustee concedes that Mr. Hall did not file his petition in bad faith, she implies that all the same the Court may find a lack of good faith. *See Green*, 934 F.2d at 572. The reason why the United States Trustee appears to suggest a lack of good faith is because Mr. Hall "is proposing to retain the Forsythia Drive house and not use that money to pay his creditors. I think that's the biggest factor here." Tr. 171:5–7. The United States Trustee's concern is justified. The continuing maintenance of two households by a debtor filing under chapter 7 should be scrutinized, but it is not axiomatic of abuse. Section 707(b)(3)(B) determinations are made on a case-by-case basis. Although the Court understands the United States Trustee's position, it disagrees with her conclusion.

---

[10]   Mr. Hall's Schedule I accurately reflected his and his wife's income as of the date of the filing of his petition. *See* Sch. I ("Estimate your monthly income as of the date you file this form."). As of filing, Mr. Hall did not expect an increase or decrease within the year as he had not yet secured new employment or had an interview with any employer. *See* Sch. I; Tr. 82:22–83:1.

In support of her position (maintaining debts for two houses establishes a lack of good faith), the United States Trustee insisted that Mr. Hall's case is analogous to two 2010 cases, *In re Brace*, 430 B.R. 513 (Bankr. N.D. Ill. 2010), and *In re Lorenca*, 422 B.R. 665 (Bankr. N.D. Ill. 2010). Tr. 160:13–161:23. Both *Brace* and *Lorenca* are distinguishable.

On the surface, *Brace* is similar to Mr. Hall's case. In *Brace*, the debtor's wife owned the home in which the couple lived while the debtor owned a second home on which he intended to reaffirm the mortgage. 430 B.R. at 515. Upon closer review, *Brace* is critically different: in *Brace* the Court concluded the presumption of abuse arose and was not overcome. Perhaps more importantly, the debtor misrepresented income and expenses to manipulate the test and artificially create the illusion that abuse was not present. As well, the United States Trustee identified multiple "excessive or unnecessary expenses,"[11] and the debtor's household income was "almost twice the median income for a comparable Illinois household." *Id.* at 515–16. With the evidence before it, the court had little trouble finding abuse.

In *Lorenca*, the debtors wanted to reaffirm a mortgage on a second home, an investment property rented for substantially less than the monthly mortgage payment. 422 B.R. at 667. Touching on the *Green* factors, the court found the debtors were "not needy and testified to no sudden calamity." *Id.* at 674. The court concluded that the debtors' desire to reaffirm both mortgages and keep both their primary residence and their investment property at the expense of their creditors was "disingenuous." *Id.*

Mr. Hall did not manipulate the means test to engineer its result. Moreover, Mr. Hall is not trying to reaffirm the mortgage on Forsythia Drive. Indeed, the Court granted relief from stay to the holder of the first deed of trust on Forsythia Drive early in this case and there is

---

[11]    It appears the court found it unnecessary to discuss the excessive expenses in greater detail because it had already rejected the debtor's attempt to circumvent the means test, finding that the debtor's case was both presumptively abusive and that the debtor failed to rebut the presumption. *Id.* at 515.

nothing standing in the way of foreclosure.  The salient point is that by reaffirming the mortgages on their second homes, the debtors in *Brace* and *Lorenca* wanted to keep their property—and at the same time assume personal mortgage liability—at the expense of their unsecured creditors.  Mr. Hall's case stands in stark contrast: the chance to free himself from personal liability on these mortgage debts (which are sizably undersecured) is the reason he filed for bankruptcy.

Contrary to the cases relied on by the United States Trustee, the indicators of lack of good faith and abuse are not present in this case.  *Cf. In re Fox*, 521 B.R. 520, 531 (Bankr. D. Md. 2014) (finding abuse when debtors wanted to keep three rental properties at a monthly loss of $8,000, compiled over $90,000 in credit card debt, made material misrepresentations regarding their income and assets, and did not file the petition in good faith).  The Court finds Mr. Hall's continuing maintenance of both properties does not in and of itself show a lack of good faith.

F.  The relation of the debtor's future income to his future necessary expenses; or, the ability to pay

The parties agree that, although not dispositive, the debtor's ability to pay his creditors is the primary factor to consider in a totality of the circumstances approach.  Determining whether a debtor has the ability to repay requires a bankruptcy court to predict an uncertain future based on the evidence it has at present.  What the Court has is a snapshot as of the petition date reflected on Schedules I and J.  "The Court's analysis must begin with Schedules I and J."  *In re Calhoun*, 396 B.R. 270, 276 (Bankr. D.S.C. 2008), *aff'd*, 650 F.3d 338 (4th Cir. 2011).  Yet, when considering ability to pay as a factor for the totality of circumstances potentially demonstrating abuse, the Court "looks at the debtor's actual post-petition income and

expenses—rather than the blend of hypothetical and actual income and expenses—as well as other factors." *In re Denzin*, 534 B.R. 883, 886 (Bankr. E.D. Va. 2015).

        1. *Ability to Pay Analysis*

The United States Trustee maintains that Mr. Hall "has the ability to make payments to his creditors whether outside or inside of bankruptcy" because his scheduled expenses overstate what is reasonable or necessary. Mot. to Dismiss ¶ 36. Specifically, the United States Trustee challenges all expenses associated with Forsythia Drive on lines 4 and 5 of Schedule J and the expenses listed on lines 12, 14, 15c, 15d, 18 and 21 of Schedule J. *Id.* At hearing, the United States Trustee also questioned the expenses for care of Mr. Hall's three children on line 8 and the Lakeland Court HOA dues on line 20. The United States Trustee implies that by eliminating these expenses, Mr. Hall can repay his creditors.

        a. Mr. Hall's ability to pay outside of bankruptcy

It is obvious that based on the expenses as scheduled Mr. Hall lacks the ability to pay his creditors outside of bankruptcy. That is, his expenses on Schedule J exceed his household income on Schedule I. According to the United States Trustee, this Court should not rely on Mr. and Mrs. Hall's schedules to provide an accurate assessment of Mr. Hall's ability to pay his creditors. The United States Trustee points out that Mr. Hall's household income has increased since he filed the petition and his scheduled expenses overstate what is reasonable or necessary.

        b. Mr. Hall's income

The parties agree that following the filing of his bankruptcy petition, Mr. and Mrs. Hall's household income increased. Mr. Hall's new employment increased his net income by approximately $607 per month, yielding monthly income of $5,587.78. *See* Sch. I; UST Ex. 22. Mrs. Hall's income also increased by about $76 per month, yielding a monthly income of

$3,626.13.  *See* Tr. 39: 10–18; Sch. I; UST Ex. 24.  This raises the couple's combined adjusted net income to $9,213.91.

### c.  Undisputed expenses

The United States Trustee does not challenge many of Mr. Hall's expenses.  The Schedule J expenses that the United States Trustee does not challenge total $5,986.[12]

### i.  *Transportation expense*

The United States Trustee challenges Mr. Hall's claimed deduction for transportation. Although she notes that it is excessive in her motion, the United States Trustee presented no evidence to support an amount for an appropriate reduction in the transportation expense. Without evidence to the contrary, the Court accepts $920 as an appropriate transportation expense.

### ii.  *Alimony expense*

The United States Trustee pointed out Mr. Hall reported $50 as an alimony expense on line 18 even though he has no such obligation.  Mr. Hall explained his mistake.  The uncontroverted testimony showed $50 was actually care of Mr. Hall's mother-in-law, albeit incorrectly reported as alimony on line 18 rather than as an additional support payment on line 19.  The United States Trustee presented no evidence to establish a reduction of this expense, and during closing argument agreed that it was appropriate.  *See* Tr. 164:25–165:1 ("The alimony, it seems like this was a mistake, it was listed on the wrong line item."). The Court will add this expense to the totals above.

### iii.  *Three agreed adjustments*

---

[12]    This figure is the sum of Schedule J lines 6, 7, 9, 10, 11, 13, 15a, 17, 20a, 20d and the first three expenses on line 21 (both student loan expenses and Mrs. Hall's credit card payments).

The parties agree to additional downward adjustments to three expenses. First, Schedule J reflects an estimated monthly homeowner's association (HOA) fee of $78 for Lakeland Court. Questioning at hearing revealed this number derived from some confusion over the bill sent by the HOA, which billed quarterly and not monthly. Tr. 114:14–20. On review of the bill and based on apparent agreement of parties, the Court will reduce the monthly Lakeland Court HOA fee to $20. *See* UST Ex. 15.

Second, Mr. Hall estimated $290 per month on Schedule J for vehicle insurance. At hearing, Mr. Hall explained that he had used the full amount from his insurance bill, which combined life insurance and vehicle insurance. Tr. 115:9–25. Based on testimony, agreement of the parties, and the insurance bill admitted into evidence, the Court finds that the monthly vehicle insurance expense should be reduced to $180.72. *See* UST Ex. 18; Tr. 30:1–3.

Third, the United States Trustee agreed that Mr. Hall should be allowed to claim a $100 lawn care expense for Lakeland Court, representing half of the line 21 amount claimed for both properties. Tr. 112:17–114:13, 146:14–25, 159:8–13.

Considering the above additions and adjustments the undisputed expenses reach $7,256.72.[13]

### d. Forsythia Drive expenses

Mr. Hall and his wife own and have mortgages against Forsythia Drive and Lakeland Court, respectively. For Mr. Hall to be able to pay his debts, he must be able to satisfy all of his mortgages as well as his unsecured debts. The fact that the United States Trustee asserts Mr. Hall should not be permitted to deduct expenses for both Forsythia Drive and Lakeland Court does not render these expenses nonexistent. The amounts associated with Forsythia Drive are

---

[13]     $5,986 + $920 + $50 + $20 + $180.72 + $100 = $7,256.72.

not disputed, even if, according to the United States Trustee, such expenses are unreasonable. Neither party indicated that the mortgage holders had or would voluntarily forgive the indebtedness or that the collateral could satisfy the debt. The exceptional disparity between the value of Forsythia Drive and the debt against it sets this case apart from other cases in which a chapter 7 debtor may be claiming expenses for a second home. In this case, Mr. Hall simply cannot sell the house because it will not render anywhere close to the amount of the mortgage debt, and if he faces foreclosure without bankruptcy protection, he will be personally liable for the resulting substantial deficiency. With that in mind the Court cannot merely erase (or ignore) the expenses or the indebtedness associated with Forsythia Drive when considering Mr. Hall's actual ability to pay outside of bankruptcy. These expenses are $1,787.25.[14]

### e. Overstated expenses

The United States Trustee claims a number of additional adjustments will more accurately reflect, according to her, Mr. Hall's actual expenses. For the purposes of this analysis, the Court will adopt the United States Trustee's figures, which are as follows: (i) $97.92 for professional education and certification expenses instead of $225.00 (scheduled); (ii) $223.91 for childcare, education, and children's extracurricular activities instead of $1140.00 (scheduled); (iii) $50 for charitable contributions instead of $240.00 (scheduled); (iv) $37.45 for pet insurance instead of $40.00 (scheduled); (v) $108.33 for pet boarding, vet and food instead of $170.00 (scheduled). These adjusted expenses total $9,561.58.[15]

### f. No ability to pay

---

[14]     The amounts for Forsythia Drive on lines 4 and 5 of Schedule J total $1,687.25. Mr. Hall testified that half of the $200 expense for lawn care is attributable to Forsythia Drive. Tr. 114:2–6. The parties did not break out any of the other expenses as specifically related to Forsythia Drive. Accordingly, the Court will use $1,787.25 ($1687.25+$100) as the expenses related to Forsythia Drive.

[15]     $7,256.72 + $1,787.25 + $97.92 + $223.91 + $50 + $37.45 + $108.33 = $9,561.58.

The above analysis explains why even using the numbers asserted by the United States Trustee to be the actual amounts for Mr. Hall's expenses, he does not have the ability to pay his debts. Deducting the adjusted expenses, $9,561.58, from the household income at the time of the hearing, $9,213.91, Mr. Hall has a *negative* net monthly income of $347.67. Using the couple's household income as of the petition date, $8,530.39, results in a negative net monthly income of $1,031.19. The Court finds that Mr. Hall lacks the actual ability to pay his creditors outside of bankruptcy.[16]

G.    Hypothetical chapter 13

The United States Trustee asks this Court to consider an alternate analysis in which Mr. Hall has abandoned Forsythia Drive and incurs no related monthly expense for this underwater property. According to the United States Trustee, if Mr. Hall surrenders Forsythia Drive, he would have the ability to repay his unsecured creditors. For the reasons already explained, the Court cannot ignore the debt associated with Forsythia Drive. At best what the United States Trustee can show is that Mr. Hall may convert to chapter 13, surrender Forsythia Drive in the process, and probably provide a dividend to unsecured creditors.

To be sure, the United States Trustee is correct that Mr. Hall could convert to chapter 13. Mr. Hall could propose a plan that would likely yield some dividend. How much of a dividend remains unclear, and the Court is not convinced the United States Trustee showed that a "substantial" dividend is likely.[17] What is obvious, however, is that surrendering Forsythia Drive

---

[16]      The United States Trustee also alleged in her motion that Mr. Hall makes voluntary retirement contributions. Other than simply pointing out that Mr. Hall may be making a voluntary contribution of some amount, she did not show how this fact renders Mr. Hall's chapter 7 an abuse or pursue the issue at hearing.

[17]      Although the United States Trustee argued that Mr. Hall could provide a "substantial" dividend to his unsecured creditors, she naturally was unable to define "substantial" or provide any particular projections under chapter 13. No one could do so in this case given that the potential deficiency claims cannot be calculated at this time. The United States Trustee provided hypothetical plan payment amounts but not plan calculations. The United States Trustee's proposed plan payment amounts are questionable however because she could not predict Mr. Hall's

would result in a six-figure deficiency claim—in excess of $120,000 based on the tax-assessed value and the outstanding mortgage debt alone, without accounting for fees, costs and charges associated with the foreclosure and the continued missed payments.

That said, if Mr. Hall converted to Chapter 13, his unsecured creditors would benefit. This circumstance should not be taken lightly; its presence is significant.  For this reason, the Court will take the opportunity to consider the challenged expenses and the United States Trustee's contention that by considering Mr. and Mrs. Hall's post-petition income compared with his reasonable and necessary expenses, but reduced by expenses the United States Trustee identifies as unnecessary or unreasonable expenses, Mr. Hall will have excess disposable income sufficient to repay a "substantial" portion of his unsecured debts.  As described below, the Court is not convinced he can.

The Court now turns to those expenses the United States Trustee argues are overstated. The expenses in dispute fall into four main categories: (i) professional education and certification expenses; (ii) pet care; (iii) charitable contributions; and (iv) childcare, education, and the children's extracurricular activities.  Factored in with the actual income and the undisputed expenses, the Court considers a hypothetical ability to pay.

### 1.  *Continuing Professional Education and Maintaining Employment*

One expense associated with Mr. Hall's new position is the required continuing professional education certifications and training.  *See* Tr. 84:20–85:2.  Every three years, Mr. Hall is required to take a minimum of 120 continuing professional education credits.  Tr. 85:3–8. On his Schedule J, Mr. Hall estimated his monthly professional education and certification expense at $225.   The United States Trustee argues that the monthly expense should be

---

future household expenses given working parents, twin teenagers of driving age, a young child and a dependent parent with advancing dementia.

approximately $97.92. This figure was arrived at by dividing the amount paid for one course ($995) and the associated fees and dues ($180) by twelve ($1,174/12 = $97.92). UST Ex. 21; *see* UST Ex. 27. Mr. Hall testified that the course for which he provided a receipt qualified for twelve hours of credit. Although this may have been the only education receipt provided to the United States Trustee, this is not the only expense associated with his required continuing education.

Because he needs 120 hours every three years, Mr. Hall must complete, if averaged, forty hours each year. Tr. 85:3–8. Based on this one purchase, at a minimum, Mr. Hall will spend $3,601.66 each year for his credit, counting the membership dues as a yearly expense [(40 hours required per year)/(12 hours of credit)*($995 charged for 12 hours)+$170 basic membership and chapter dues=$3,486.67].[18] Of course, this estimate does not take into account that some courses will be more expensive or the fact that he may be taking slightly more or less hours in a given year of the three-year period. *See* Tr. 86:12–20 (Mr. Hall testifying that courses can run as high as $5,000 depending on the depth and length of the course). Based on the evidence presented, the average yearly expense for these credits would be at least $3,486.67, or $290.56 per month.

## 2. *The Family Dog*

Mr. Hall has one dog, which weighs approximately one hundred twenty pounds. Tr. 129:13–25.

The United States Trustee challenged the $40 estimated expense on line 15d for pet insurance. At hearing, the United States Trustee produced proof that the actual monthly expense was only $37.45, leaving $2.55 available for creditors. *See* UST Ex. 19; Tr. 114:21–115:8. In this analysis of the hypothetical ability to pay, the Court will use the amount of $37.45.

---

[18]    Stated differently, $995 divided by 12 multiplied by 40 yields $3,316.67, plus $170 equals $3,486.67.

The United States Trustee also asserts that the amount listed on line 21 for pet boarding, vet, and food of $170 is excessive for the dog. Little evidence was presented on this topic. As to boarding and grooming, the United States Trustee filed Exhibit 20, which is various receipts from a kennel in Culpeper, Virginia. *See* UST Ex. 20. The bills provided were for services provided in six separate months. If these bills are indicative of a typical month, the total amount ($650) would translate into a monthly amount of approximately $108.33 ($650/6). *See* Tr. 129:18–19 ("We send the dog to the kennel or we take the dog to the kennel approximately once a month.").

Mr. Hall testified that the dog "usually goes through a couple bags [of dog food] each month" and that "one bag of dog food is approximately $40." Tr. 130:5–6. This fact does not appear to be contested, and thus it appears that the food expense for the dog is approximately $80 each month.

No further evidence was presented on expenses related to the dog, although it is conceivable that more expenses exist. Based on the evidence presented, the Court finds that the actual expenses for the dog total at minimum $225.78 for food, boarding, grooming, and insurance.

### 3. *Charitable Contributions*

Mr. Hall listed on line 14 of Schedule J monthly charitable contributions of $240. In her motion to dismiss, the United States Trustee pleads that the charitable contributions are "[n]ot supported by itemized deductions claimed on 2014 and 2015 federal taxes." Mot. to Dismiss ¶ 29. At hearing, the debtor testified that he did his taxes on his own. Tr. 133:1–133:5. Since he had no documents to support the deduction, as he had frequently tithed in cash, Mr. Hall decided only to claim the amount tithed via check, and which thus showed up on the giving statement

provided by the church, as a tax deductions.  Tr. 133:8–133:17.  The Court finds the debtor's tax returns more reliable evidence for the charitable contribution deduction.  The Court will consider $80.38 monthly for this amount.[19]

### 4. *The Children*

Mr. Hall has three children.  The sixteen-year-old twins are high school students, who are quite active in extracurricular activities.   His other daughter, age 6, requires before and after school care given Mr. Hall's and Mrs. Hall's work schedules and related commuting times.

On line 8 of Schedule J, Mr. Hall estimated monthly expenses for childcare and children's education costs at $850.  For the children's sports, band expenses, and club dues, Mr. Hall estimated on line 21 an additional $290 per month.  Mr. Hall, therefore, estimated spending approximately $1,140 per month for his three children.  In her motion to dismiss, the United States Trustee does not challenge the reasonableness of the $850 expense on line 8.  She does, however, assert that the $290 expense on line 21 is excessive when combined with line 8.

Mr. Hall testified concerning the total costs of child care, in particular on the before and after school care costs for the six year old daughter and the costs associated with two children active in the school band.  Tr. 118:4–129:5, 133:18–134:10.  The Court recognizes that it is difficult to provide receipts and other proof concerning each dollar spent on a child as he or she attends school and participates in extracurricular activities.  Both parties skillfully presented as much evidence as possible on this expense.  The United States Trustee bases her figures on receipts and other documentary evidence provided by Mr. and Mrs. Hall regarding the children's expenses.  For purposes of this opinion, the Court will accept the figure asserted by the United

---

[19]       In both the 2014 and 2015 tax return, Mr. and Mrs. Hall itemized their deductions.  For tax year 2014, Mr. and Mrs. Hall listed $1,329 for gifts to charity.  UST Ex. 8.  For tax year 2015, they listed $600 for gifts to charity. UST Ex. 9.  Based on tax years 2014 and 2015, the Halls' charitable contributions average approximately $80.38 per month.

States Trustee and exclude from the calculation the amount on line 21.  Accordingly, the Court

will only use the base figure from line 8 for childcare and children's education costs of $850.[20]

Based on the foregoing, the Halls' monthly expenses total $8,703.44 ($290.56 + $225.78

+ $80.38 + $850 + $7,256.72).  Considering the alternative scenario, Mr. Hall would have

$510.47 per month ($9,213.91 – $8,703.44 = $510.47) or at most $540.85 per month (assuming a

charitable contribution of $50 per month instead of the average of his prior two years).  Mr.

Hall's nonpriority, unsecured debt as scheduled totals $79,526 plus a mortgage deficiency that is

likely between $100,000 and $150,000,[21] or more.  In addition, Mr. Hall will incur attorney's

fees and trustee's commission.  Even in the most positive light, payments over sixty months

would not pay the debt in full, and probably not even 20 cents on the dollar.[22]  The United States

Trustee did not define "substantial," and this Court does not either.  Even so, the Court is not

convinced that the dividend of somewhere between 11% and 20% is "substantial."[23]

It is true that Mr. Hall could pay a dividend to his unsecured creditors in a chapter 13

case.  His failure to elect to do so is not, in this case, an abuse of the provisions of chapter 7.  As

---

[20]     At bottom, the United States Trustee contended Mr. Hall's expenses were unreasonable to the extent they exceeded amounts for which he had actual receipts.  Although for purposes of this analysis, the Court is adopting the United States Trustee's figure for this expense, the Court rejects the argument that if no receipt exists then the expense does not exist.  Such an assertion would lead to misguided findings.  This would be especially true if the calculation fails to take into account obvious expenses incurred by parents of teenage dependents.

[21]     According to the mortgage holder's certification at the time of the motion for relief from stay eight months prior to this ruling, the first mortgage debt on Forsythia Drive was approximately $270,908.84.  At foreclosure it is expected the property may not yield more than the tax assessed value of $150,000.  The resulting deficiency would be about $120,909, but likely more considering the addition of fees, costs and charges associated with the foreclosure and the continuing missed payments.

[22]     $510.47 x 60 = $30,628.20.  After deducting a 10% trustee commission yields $27,565.38.  Assuming a $4,000 attorney's fee leaves $23,565.38.  If the house deficiency is only $100,000, and assuming all of the student loans are maintained directly and would not share in a dividend, then the dividend would be almost 20% ($23,565.38/$119,526 = 19.71%).  Assuming the same but a house deficiency of $120,000 renders a 16.9% dividend, and assuming the same but a house deficiency of $150,000 reduces the proposed dividend to 13.9%.  If the monthly plan payments were $540.85 for 60 months, the result is essentially the same.

[23]     *See supra* note 22.

the Fourth Circuit noted concerning the debtor in Green, "[i]f the debtor, acting in good faith, preferred to effect the discharge by making extended payment to his creditors over time, presumably he would have filed under Chapter 13. The court may advise the latter, but the election remains with the debtor . . . ." *Green*, 934 F.2d at 573.

G. Other factors

The Green factors are not exhaustive. Federal Rule of Bankruptcy Procedure 1017 requires the United States Trustee to set forth in her motion to dismiss "with particularity the circumstances alleged to constitute abuse" in support of dismissal. Neither in her motion to dismiss nor at hearing did the United States Trustee assert any additional circumstances not identified in this opinion or factors not listed in *Green*.

The rub for the United States Trustee is Mr. Hall's maintenance of Forsythia Drive and Lakeland Court. For the reasons already explained, in this particular case, the Court finds that the continuing maintenance of both properties is not an abuse of chapter 7. All in all, the United States Trustee shows at best the presence of one factor: that Mr. Hall could provide a dividend to his creditors under chapter 13. As much as this Court would like to see Mr. Hall pursue chapter 13, the fact that he did not do so, by itself, is insufficient for this Court to conclude that a discharge under chapter 7 for Mr. Hall is an abuse. Indeed, this single circumstance does not show solvency nor that the totality paints a picture of abuse of the provisions of chapter 7.

**CONCLUSION**

Mr. Hall filed a Chapter 7 Statement of Current Monthly Income and Means-Test Calculation demonstrating the presumption of abuse did not arise under section 707(b)(2). No party disputed the lack of presumption of abuse. Since no presumption of abuse has arisen the United States Trustee asks this Court to consider the totality of Mr. Hall's financial

circumstances and find abuse as a basis to dismiss this case.  Having reviewed the record in this

case, the Court fails to find evidence sufficient to support a showing that Mr. Hall's financial

circumstances demonstrate abuse.

When faced with a motion under 707(b), the Court primarily must question whether there

is "abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his

creditors."  *Green*, 934 F.2d at 572.  The Court answers this question in the negative for Mr.

Hall.  Mr. Hall is not a debtor seeking to take unfair advantage of his creditors.  *See Almond*, 344

B.R. at 479–80 ("Congress appears to have been concerned about persons who knowingly or

recklessly live beyond their means, who live the good life using the resources of their creditors to

do so and then choose to walk away from their debts even though they have the financial ability

to pay them . . . ."); *see also In re Smith*, 354   B.R. 787, 791 (Bankr. W.D. Va. 2006)

(determining substantial abuse and noting "there must be a strong showing of some additional,

improper intent on the part of the debtor, aside from the intent to discharge one's debts, in order

to warrant a dismissal under Section 707(b)").  On the contrary, Mr. Hall has not made reckless

or lavish lifestyle choices.  He is trying to relieve himself from personal mortgage liability that

has stretched his family's finances to the breaking point.  Contrary to the debtors in *Brace* and

*Lorenca*, the two cases on which the United States Trustee places great weight, Mr. Hall is not

seeking to retain both Forsythia Drive and its attendant liabilities at the expense of his creditors.

The United States Trustee was unable to demonstrate behavior or conduct designed to

take unfair advantage of creditors, or in other words, conduct demonstrating the type of abuse

described by the Fourth Circuit in *Green*. The Court concludes that the United States Trustee has

not met her burden of proof under section 707(b) to demonstrate abuse.  Accordingly, the Court

denies the United States Trustee's motion to dismiss.

The Court will contemporaneously issue an order consistent with the findings and ruling of this Memorandum Decision.

Date Entered:   June 30, 2017

Rebecca B. Connelly
United States Bankruptcy Judge